UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOAN WIXON,

        Plaintiff,

                                Case No. 04-10183-BC

v.                                   Hon.  David M. Lawson

FEDERAL INSURANCE COMPANY,

        Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

      The question presented by the defendant's motion for summary judgment now before the Court is whether the plaintiff has produced sufficient evidence to constitute a triable fact issue on her fulfillment of the conditions that allow her to recover the benefits under a disability insurance policy issued by the defendant.  The Court finds that genuine issues of material fact preclude summary judgment for the defendant.

### I.

      On December 1, 2000, the plaintiff, Joan Wixon, purchased a disability insurance policy underwritten by defendant Federal Insurance Company, for which she paid monthly premiums of $9.  The policy purported to pay her $1 million in a lump sum if she became permanently and totally disabled, as defined by the policy.  Wixon has filed suit claiming that she meets the definition and therefore is entitled to $1 million.  The defendant contends that it has no contractual liability because Wixon does not satisfy all of the definitions set forth in the policy.  It argues that the undisputed facts in the case entitle it to a judgment in its favor as a matter of law.

At the time of the June 13, 2005 hearing on the defendant's motion for summary judgment, neither side had submitted the actual insurance policy; rather, the parties relied on a plan summary that was attached to the motion papers.  The defendant filed a supplemental exhibit on June 15, 2005, which contains the relevant portions of the policy.  The policy definitions are crucial to the determination of the present dispute.

According to the insurance policy, as modified by various endorsements,

**Permanent Total Disability** means **Accidental Bodily Injuries** that solely and directly cause the **Primary Insured Person's**:

**Loss of**:

**Use of** One Hand and One Foot; or
**Use of** Both Hands or Both **Feet**; or
**Sight of Both Eyes**; or
**Hearing of Both Ears**; or
**Speech**, and;

1) prevent the **Primary Insured Person** from engaging in any gainful occupation for which the **Primary Insured Person** is qualified, or could be qualified, by reason of education, training, experience, or skill; and

2) cause a condition which is medically determined by a **Physician**, approved by the **Company**, to be of continuous and indefinite duration; and

3) require the continuous care of a **Physician**, unless the **Primary Insured Person** has reached his/her maximum point of recovery.

Supp. Ex. to Mot. for Summ. J. at Endorsement #4, p. 2.  The policy further defines the emboldened terms as follows:

**Loss of Use** means the permanent and total inability of the specified body part to function, as determined by a **Physician**.

**Loss of Use of Hand** means the **Loss of Use** at or above the knuckle joints of at least four (4) fingers on the same hand or at least three (3) fingers and the thumb of the same hand.

-2-

> **Loss of Use of Foot** means the **Loss of Use** of the foot at or above the ankle joint.

*Id*. at 3. An accidental bodily injury is defined as "bodily injury which is Accidental and the direct

cause of a **Loss**." Supp. Ex. to Mot. for Summ. J. at Contract, p. 3. An "accident" is

> a sudden, unforeseen, and unexpected event which happens by chance, arises from
> a source external to the **insured Person**, is independent of illness, disease or other
> bodily malfunction and is the direct cause of loss.

*Ibid.* The policy also excludes certain losses, specifically those caused by a pre-existing condition.

> This insurance does not apply to Loss caused by or resulting from a **Pre-Existing**
> Condition. A **Pre-Existing Condition** means illness, disease or **Accidental** injury
> of the **Insured Person** for which medical advice, diagnosis, care or treatment was
> recommended or received within the six (6) months prior to the effective date of
> **Insured Person's** coverage under this policy. A **Pre-Existing** Condition will not
> be excluded after (12) months has elapsed from the effective date of the **Insured**
> **Person's** coverage.

Supp. Ex. to Mot. for Summ. J. at Endorsement #4, p. 3.

The plaintiff worked as a nurse for Alpena General Hospital's home care division. She

alleges that on May 18, 2001, she fell when caring for a patient. The plaintiff was kneeling on the

patient's bed when the patient's leg spasmed, knocking the plaintiff off the bed and onto the ground.

The plaintiff completed an accident report on that same day that described her accident as follows:

> I was being oriented by Joyce Bisawz. Crawl on knees across bed kneel on 1 knee
> and put 1 foot Flaton [sic] bed. Lift clt [sic] leg. All pressure was on Rt Knee. R
> Knee popped Swelled [sic] double size in 1hr. Previous had both knees replaced
> from working in . . . (L) knee sore.
>
> INJURY TYPE
>
> Pain; Other; R knee severe pain and swelling; L Knee sore slightly swollen
>
> . . .
> CAUSE: What MAY have contributed to the incident? (Choose the BEST one; other
> may be discussed in description)
>
> Technique (Lifting, recapping, etc.); kneeling

-3-

> Awkward Position
> Other (Describe) Unable to kneel-from knee replacement

Def.'s Mot. Summ. J. Ex. B, Incident Report and Injury Claim at 1.  The plaintiff filed a claim for

benefits dated June  22, 2002 describing the incident in the following terms:

> I was being oriented by J. Bisanz . . . Care of Quadraplegic.  To do his p.t.  While on
> Knees (Rt) Leg ?? on arm and knocked me over . . .
>
> . . .
> Spun me to the left and backwards.  Used Left hand to stop from spinning off bed
> onto floor.  Left arm numb for 2-3 months.  Feeling never came back shoulder
> surgery and wrist.  Still need to fuse vertebrae in neck to ?? severe pain.  Rt Knee
> pops and I fall . . . severe pain - uncontrolled.  Legs numb 99% of time.  Need to look
> ?? to see if I'm touching floor to stand

*Id*. at 2-3.  The plaintiff indicated in the blank for a description of the nature of insured's injuries that

she sustained injuries to her "Rt knee and L arm wrist, arm and shoulder and neck [sic]."  *Id*. at 2.

The description in the plaintiff's application includes an indecipherable diagram of the incident.

The defendant offered evidence that the plaintiff had injured her knees on a prior occasion,

and in fact had knee replacement surgery on her left knee in 1998 and right knee in 1999.  She also

had arthritis in her shoulder joint.  Her knee surgeon, Dr. Anthony deBari, testified that the

plaintiff's knee problems started with arthritis, and then they became worse following the accident

at work.  Answer to Mot. Ex. 4, Dep. of Dr. deBari at 55-56.  Dr. Michael Sperl, who examined the

plaintiff at her attorney's request, testified that her shoulder and wrist injuries were aggravated by

the accident, although there were prior disease processes (arthritis) that could have been

precipitating causes.  Answer to Mot. Ex. 5, Dep. of Dr. Sperl at 14-16, 48.  The defendant hired

physicians to examine the plaintiff as well.  Dr. Thomas Rumney testified that the plaintiff suffered

from a prior degenerative disease process, the fall did not cause the plaintiff's carpal tunnel

syndrome, and he did not know the cause the plaintiff's knee pain. Def.'s Mot. Summ. J. Ex G, Dr. Thomas Rumney Dep. at 13-14, 23-24, 26, 30.

The defendant's claims examiner, Christopher Evans, was assigned to reviewed the plaintiff's claim file. His task was to "take the facts of the claim and apply it to the policy language." Pl.'s Answer to Mot. Ex. 2, Dep. of Christopher Evans at 12. A physician selected by the defendant, Dr. William Higginbotham, conducted a evaluation on September 12, 2002 in order to assist Evans' determination whether the plaintiff's injuries satisfied the requirements under the insurance policy. *Id.* at 43. The physician had received a copy of the policy language and determined that the plaintiff was incapacitated from performing her usual and customary job and that she had reached the point of maximum medical improvement. *Id.* at 44, 50. Dr. Higginbotham wrote in his report form that the plaintiff's injuries to her right knee and shoulder related to her 2001 accident. *Id.* at 43. An interoffice memorandum to the examiner stated that the doctor's reference to the right knee must have been a typographical mistake. *Ibid.* The doctor issued three more reports at the request of the insurance company, which desired "a clearer explanation of what his opinion was." *Id.* at 49. The doctor's final report stated that the plaintiff's injuries satisfied the terms of the insurance policy. Dr. Higginbotham concluded:

> I have received a request for additional information concerning Joan Wixon, particularly whether or not the patient meets the criterion of Chubb's policy for permanent and total disability.
>
> I have reviewed that policy which was sent to me in a document that details the requirements for permanent and total disability. I understand those requirements to be loss of use of one hand and one foot or both hands or both feet or both eyes or hearing in both ears or speech which prevent the person from engaging in any gainful employment that is medically determined by a physician. Review of Ms. Wixon's chart and records indicate that she does have at least two extremities involved, a right knee that was a total knee replacement and a left shoulder difficulty. She has other

problems as well.  This would, based upon my interpretation of the document, indicate that she meets the criterion for permanent and total disability.

Pl.'s Answer to Mot. Ex. 8, Dr. Higginbotham letter to Defendant's Accident Claims (Oct. 17, 2002).  The claims examiner contacted the doctor after receiving the letter to verify that the doctor understood the policy language.  Answer to Mot. Ex. 2, Dep. of Christopher Evans at 51.

On May 18, 2001, the defendant denied the plaintiff's claim for disability benefits.  The denial letter stated:

> We have received and reviewed your claim information, information from the policyholder, copies of your medical records and the Independent Medical Exam Report from Dr. Higginbotham.  That information indicates that you do not have the total, complete and permanent loss of use of one hand and one foot, or both hands or both feet, sight of both eyes, hearing of both ears or speech.  Therefore your condition does not appear to meet this Policy's definition of a Permanent Total Disability and no coverage would be available for this claim.

Pl.'s Answer to Mot. Ex. 6, Letter to plaintiff (May 18, 2001).

The plaintiff also submitted evidence that the plaintiff subsequently injured her knees in another fall. The plaintiff testified that she again injured her left knee in a 2003 fall, stating that:

> Q.  Did you injure yourself in February of 2003 by slipping and falling when getting out of a car?
> A.  Yes.
> Q.  What happened then?
> A.  I went to put my foot down, and my leg went sideways, and I went down on ice.
> Q.  Which leg?
> A.  Left.
> Q.  Where did that occur?
> A.  At Family Dollar.

*Id*. at 42-43.  The plaintiff also has testified that she has qualified for Social Security Disability benefits because she cannot perform her past relevant work.  *Id.* at 60-61.  That condition was confirmed by Dr. Higginbotham in a letter to the defendant's representative dated September 12, 2002.  Pl.'s Answer to Mot. Ex. 7, Dr. Higginbotham letter to Chubb Group (Sept. 12, 2002) at 2

-6-

(stating that "[al]though she appears to be incapacitated from performing her usual and customary job, she would not be considered to be an invalid").

The plaintiff filed a one-count complaint on April 21, 2004 in Montmorency County, Michigan circuit court alleging at the defendant breached the insurance contract by failing to pay benefits. The defendant filed a notice of removal on July 27, 2004. On May 13, 2005, the defendant filed its motion for summary judgment, to which the plaintiff responded.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis*

-7-

*Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized,

-8-

however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

When presented with a motion for summary judgment, a court can interpret a contract if "(a) the contract's terms are clear, or (b) the evidence supports only one construction of the controverted provision, notwithstanding some ambiguity." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999). If the court finds the provision is unambiguous, terms are given their plain and ordinary meaning, and the provision is "enforced as written" at the summary judgment stage. *Id.*; *Equitable Life Assurance Society of the United States v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998).

In cases involving a breach of an insurance contract, courts are bound by specific contractual language and must enforce the language as written. *Heinser v. Frankenmuth Mutual Ins. Co.*, 449 Mich. 156, 161 (1996). In Michigan, when a contract is unambiguous, the court will enforce its clear terms. *Raska v. Farm Brokers Insurance Co.*, 412 Mich. 355, 361-62, 314 N.W.2d 440 (1982); *Usher v. St. Paul Fire and Marine Insurance Co.*, 126 Mich. App. 443, 447, 337 N.W.2d 351 (1983). "A court cannot remake a contract through construction . . . to find a meaning not intended," nor will the court "read out . . . words . . . to reach the results" sought by one of the competing parties. *See Damerau v. Rieckhoff Co., Inc.*, 155 Mich. App. 307, 312, 399 N.W.2d 502 (1986).

Under Michigan law, an insurance policy must be enforced according to its terms. *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 354, 596 N.W.2d 190, 193 (1999). Accordingly, the insurer is not liable for any risk it did not assume. *Id*. To determine whether an insurance policy covers a particular act, the Court must decide if the occurrence section of the policy

-9-

includes the particular act, and if so, whether the exclusion section of the policy denies coverage in that case. *Fire Ins. Exch. v. Diehl*, 450 Mich. 678, 683, 545 N.W.2d 602, 605 (1996).

It is the insured who has the burden of proving that her loss falls within a grant of coverage in the policy. *Clark v. Hacker*, 345 Mich. 751, 756, 76 N.W.2d 806, 809 (1956); *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005) (stating that "the insured bears the burden of proof as to whether the policy applies to the loss upon which the claim is based"). However, the insurer has the burden of establishing the applicability of an exclusion to coverage. *Roddis Lumber & Veneer Co. v. American Alliance Ins. Co.*, 330 Mich. 81, 88, 47 N.W.2d 23, 26 (1951); *see also Fresard v. Mich. Millers Mut. Ins. Co.*, 414 Mich. 686, 327 N.W.2d 286, 289 (1982) (holding that the insurer has the burden of showing that a specific tendered claim is not covered under its policy).

Whether a contract provision is clear or ambiguous is a question of law for the court. *Campbell v. Potash Corp. of Saskatchewan, Inc.*, 238 F.3d 792, 797 (6th Cir. 2001); *GenCorp*, 178 F.3d at 817. Contract provisions are ambiguous if they are "reasonably and fairly susceptible to multiple understandings and meanings." *Equitable Life*, 143 F.3d at 1016. Legal ambiguity requires "two or more reasonable interpretations." *GenCorp*, 178 F.3d at 819. Disagreement between the parties does not necessarily constitute ambiguity. *Ibid*. Likewise, ambiguity does not exist solely because the policy fails to define a term. *Vanguard Ins. Co. v. Racine*, 224 Mich. App. 229, 232-33, 568 N.W.2d 156, 158 (1997). Courts will neither give words a "forced or strained meaning" nor make a new contract under the guise of interpreting a contract. *Edgar's Warehouse, Inc. v. United States Fid. & Guar. Co.*, 375 Mich. 598, 602, 134 N.W.2d 746, 748 (1965). Instead, courts read the entire policy and give each term its commonly understood meaning. *Herman Miller, Inc. v.*

-10-

*Travelers Indem. Co.*, 162 F.3d 454, 455 (6th Cir. 1998). If the Court finds the contract terms are ambiguous, then the trier of fact determines the intent of the parties and, therefore, summary judgment is inappropriate. *B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d 587, 594 (6th Cir. 2001).

In this case, the defendant argues that the plaintiff has not offered evidence to create a jury-submissible question in four different areas: 1) whether the plaintiff's injuries arose from an "accident" within the meaning of the policy; 2) whether the accident actually caused the loss; 3) whether the plaintiff suffered the loss of use of two extremities; 4) whether she retained the ability to return to work. The plaintiff insists that fact questions exist on all of these points that preclude summary judgment.

A.

According to the policy, the plaintiff's disability must arise from "a sudden, unforeseen, and unexpected event which happens by chance, [that] arises from a source external to the [plaintiff], [and] is independent of illness, disease or other bodily malfunction." The defendants argue that the plaintiff's injury does not fit this definition because the plaintiff had prior bilateral knee replacements occasioned by degenerative arthritis and a fall, and the plaintiff testified that she was not supposed to kneel after her knee surgeries. The plaintiff argues that her injuries were not caused by her prior conditions and that she sustained a loss under the terms of the contract as determined by a physician.

The essence of the defendants' argument is that the plaintiff's loss had multiple causes, some of which were the pre-existing conditions of degenerative arthritis and bilateral knee surgery. However, the policy states that for a pre-existing condition to be disqualifying, the illness, disease

-11-

or injury must be one "for which medical advice, diagnosis, care or treatment was recommended or received within the six (6) months prior to the effective date of [the plaintiff's] coverage under this policy," and that the condition "will not be excluded after (12) months has elapsed from the effective date of the [plaintiff's] coverage." According to the policy summary, coverage commenced on November 1, 1999. Df.'s Mot. Summ. J. Ex. A, Plan Description at 1. The knee surgeries took place in 1998 and 1999, and the accident did not occur until May 18, 2001.

According to the plaintiff's description, she was injured when she was repositioning a patient and he kicked her because of an involuntary muscle spasm. Although the trauma may have aggravated a pre-existing condition, according to the language of the policy those circumstances would not remove the events from the definition of "accident" or "accidental bodily injury" contained in the policy. The plaintiff offered sufficient evidence on this point.

B.

The defendants next argue that the plaintiff is not entitled to benefits because the accident was not the sole and direct cause of her loss, that is, her injuries were caused, at least in part, by her prior medical conditions. The defendants contend that to be covered by the policy an accident must be the "direct cause" and the accidental bodily injuries suffered must be "solely and directly" caused by the loss. The defendants infer this condition, presumably, from the policy definition of "permanent total disability," which must result from accidental bodily injuries "that solely and directly cause" the insured person's loss of use of two or more extremities. The defendants assert that no physician testified that the May 18, 2001 incident was the sole and direct cause of the plaintiff's inability to use her arm and leg.

In support of their argument, the defendants point to the testimony of Dr. deBari, who stated that the plaintiff had pre-existing arthritis.  Answer to Mot. Ex. 4, Dep. of Dr. deBari at 49-50. He then stated:

> Q. And again can you state within a reasonable degree of medical certainty that the tendinitis and/or impingement was caused by the April of 2001 incident independent of any underlying illness, disease or other bodily malfunction?
> A.  I can only relate it to that, again the history of the specific injury.  But I can't say with 100 percent certainty that it was only caused by that.
> Q.  What about per a reasonable degree of medical certainty which is our magic words?
> A.  I don't think I can say with a reasonable degree that it was only caused by the accident, no.

*Id.* at 55-56.  Similarly, Dr. Sperl testified the plaintiff may have been predisposed to injury by her pre-existing conditions.  He stated:

> Q.  So you're talking about aggravation and exacerbation, but any of her problems, the shoulder, the hand, the knees, both knees, do you believe the accident to have been the cause as opposed to an exacerbation?
> A.   The original causative agent is the arthritis, followed by knee surgery or replacement of the joint, followed by a work injury, which seems to have exacerbated symptoms in the right knee temporarily, with an aggravation of the underlying pathology in the left knee, with the development of ligamentous laxity, when we talk about exacerbation versus aggravation.
> Q.  That was obviously my next question.
> A.  To a physician, exacerbation means you're flaring up the symptoms but not changing the pathology.  Aggravation means you've actually changed the pathology where there's a change in the underlying status clinically.  That seems to be what happened here in the left knee.
> Q.   But in either case, the original causative agent is the arthritis for both the shoulders and knees?
> A.  Sure, and then an aggravation of the underlying pathology leading to subsequent pathology leading to additional surgery.
>
> . . .
> Q.  Do you believe that her current injuries to her knees and shoulder – let's take them one at a time.  Do you believe the current injuries to her knees were caused – let's just say, were they caused by the accident, independent of any underlying condition or bodily malfunction?

-13-

A.  Do I think it was a predisposing factor, no.  The predisposing factor being the arthritis leading to total knee arthroplasty statistically increasing her chances of reinjury.

Q.  So your answer is, no, it wasn't caused by the accident independent of the underlying condition?

A.  Correct.

Q.  And would the same thing be true of her shoulder problems?

A.  In terms of the underlying AC degenerative arthritis, yes.  It's an issue of aggravation and not specifically the causation totally.

Q.  Okay.  And one final question about the carpal tunnel syndrome, is there any evidence aside from the correlation in time that she gives that the carpal tunnel syndrome was caused by the fall as opposed to repetitive movement or any other underlying condition?

A.  No.  Again, you have to go by way of history.  You can identify the pathology clinically and by testing, but where it came from, you have to rely on an accurate history.

Answer to Mot. Ex. 5, Dep. of Dr. Sperl at 48, 61-62.  The defendant also points to the reports of

Dr. David Frye, who examined the plaintiff for her worker's compensation claim, and Dr. Brian

deBeaubien, Dr. deBari's partner.  Both note the plaintiff's prior pathology and the absence of

evidence that the May 18, 2001 incident was a cause of the plaintiff's knee injury.

The defendant, however, asks too much of the policy language on which they rely.  They

contend in essence that any prior condition that contributes to the seriousness of the consequences

of an accidental injury will disqualify the insured from disability benefits because the aggravation

of the pre-existing condition is a contributing factor that precludes a finding that the precipitating

accident was the "sole and direct cause" of the disability.  Such a reading of the disability definition,

however, renders meaningless the provision of the policy that defines and partially excludes pre-

existing conditions.  The Court must give meaning to all the terms of the contract, and construe all

the provisions together.  *See Cincinnati Ins. Co. v. Zen Design Group, Ltd.*, 329 F.3d 546, 553 (6th

Cir. 2003) (noting that "Michigan contract law requires us to look at the policy as a whole, and to

give meaning to all of its terms") (internal quotes and citations omitted).

-14-

A sensible reading of the policy would establish eligibility for benefits if a person was capable of working before an occurrence, and then loses the use of two extremities (rendering the person incapable of engaging in gainful employment) because of "a sudden, unforeseen, and unexpected event," where the disability is continuous and of indefinite duration, unless the loss of use were caused by a pre-existing condition, that is, one which existed within six months of the initial coverage and twelve months of coverage had not elapsed at the time of the accident.

The plaintiff has offered testimony from physicians that she was not disabled before the May 18, 2001 accident and she was disabled thereafter and because of it.  Dr. de Bari testified:

> Q.  Doctor, assuming the history that you have through your dealings with Ms. Wixon, assuming that it's accurate and proven at the time of trial.  Assuming the following hypothetical to be accurate and proven at the time of trial I'd like to have your opinion within a reasonable degree of medical certainty whether it's more probably than not there was any change in Ms. Wixon's underlying condition or pathology as it relates to her left knee or left shoulder.

> Assuming that when she came to you she had the problems with the bilateral knees as you discussed today, that you did the total knee replacements.  That she had still some problems primarily on the right, the left was doing much better.  Assume that she had no problems as it relates to the left shoulder then.

> Then assume again that she returned back to work after you surgeries for approximately two years performing her job as LPN up to approximately 40 hours per week.

> Assume that on or around May of 2001 that she was working with a quad patient that had gone into a spasm.  Assume that she was thrown off the bed, that when she spun she was thrown, she had twisted her left knee.  Assume that she hit the controls of the bed with her left wrist, but more importantly also the left shoulder.

> Assume that from that point forward she had the complaints, immediate onset of complaints more prominently in the knee, but then again also related the problems as it relates to the shoulder.  And then just assume the rest of the treatment basically that you've outlined for us as it relates to her complaints and treatment.

> Assuming that history to be accurate and proven at the time of trial do you have an opinion within a reasonable degree of medical certainty whether it's more probable

than not that the incident in May of 2001 caused any change in her underlying condition or pathology as it relates to Ms. Wixon's left knee and left shoulder?

MS. WHEATON: Object as to form, you can answer.

A. Yes. I think based on that and my evaluation of the patient and all that certainly the left knee was directly affected by this injury in terms of having had a pretty good total knee replacement until this injury. And then with the left shoulder I believe that it also caused the injury to the subacromial bursa certainly and the chronic pain that she's been left with.

Answer to Mot. Ex. 4, Dep. of Dr. deBari at 21-22.  Dr. Michael Sperl testified concerning the

defendant's left arm:

Q. Again, assuming the history that Ms. Wixon gave you, do you have an opinion within a reasonable degree of medical certainty whether the incident in May of 2001 caused or significantly aggravated the condition you diagnosed in the left shoulder?
A. By her history, she takes me back to the work incident in May of 2001 as being the onset of the symptoms. Number two, in reviewing the records after my exam, there's numerous references to the onset of the left shoulder problem dating to the May 2001 work incident.

Answer to Mot. Ex. 5, Dep. of Dr. Sperl at 14-15.  Dr. Sperl also testified concerning the plaintiff's

left wrist:

Q. Okay. And what would be your clinical diagnosis as it relates to left hand and wrist?
A. Post carpal tunnel release with residual median nerve irritation.
Q. And again, assuming the history that Ms. Wixon gave you, do you have an opinion within a reasonable degree of medical certainty whether the incident in May of 2001 caused or significantly aggravated that condition?
A. And again, by her history, she takes me right back to the May 2001 work incident. Secondly, independently when I looked at the medical records, the medical records talk about the onset related to the work incident.

*Id.* at 16.  Dr. Higginbotham wrote a report stating that:

I would think that given the information that there appears to be problems with her knee on the right side and her shoulder on the left side that can specifically be shown by virtue of the records and the presenting symptomatic complaints to be related to the incident that took place on May 18, 2002.

-16-

Answer to Mot. Ex. 7, Dr. Higginbotham Report (Sept. 12, 2002).

There is conflicting evidence on the issue of causation.  Likewise, there is evidence that the plaintiff was predisposed to the injury.  However, a predisposition to injury would not preclude a fact finder from determining that the accident was the sole cause of her loss in her lower extremity.  Also, since an aggravation is a clinical status change, the aggravation of the shoulder caused by the injury is sufficient causation for a finder of fact to find that the accident was the sole cause of the plaintiff's injuries.  The plaintiff's position is also supported by Dr. Higginbotham's finding that the plaintiff qualified for benefits.  Answer to Mot. Exs. 7, 8, Dr. Higginbotham Reports.  These issues are disputed, but the factual dispute is genuine and material, and summary judgment for the defendants on this issue, therefore, is not available.

C.

The defendant also contends that the plaintiff does not qualify for benefits because she has not suffered a loss of two extremities, defined as "the permanent and total inability of the specified body part to function, as determined by a Physician."  The defendant contends that the loss of use of the extremity must be permanent and total, and although limited by her injuries, the plaintiff can walk, stand, sit, drive, go to dinner, shop, and attend her grandson's football games.  Pl.'s Mot. Summ. J., Pl.'s Dep. at 47, 56, 59, 86, 88.  The defendant argues that the plaintiff retains some mobility in both knees.

The defendant states that Dr. Sperl testified that "her functional mobility would be 50% of expected normal . . . In other words, are they [the knees] perfectly normal, no.  Are they totally fused, no.  She falls in between those extremes" and "does she have a permanent limitation, yes.  Is it a 100% loss of use, no."  Answer to Mot. Ex. 5, Dep. of Dr. Sperl at 50-51, 60. Dr. deBari also

-17-

testified that "there are some functions that she can do, I think certainly not function in her normal capacity. But she'd have to be really sedentary in terms of being able to do anything because of the combination of the two knees and the shoulder." Answer to Mot. Ex. 4, Dep. of Dr. deBari at 48-49.

This evidence may be damaging to the plaintiff's case. However, she has offered evidence from which a fact finder could determine that her loss of use is total and permanent. For instance, Dr. Higginbotham, the physician chosen by the defendants to evaluate the claim, stated in a report dated October 14, 2002:

> I have reviewed that policy which was sent to me in a document that details the requirements for permanent and total disability. I understand those requirements to be loss of use of one hand and one foot or both hands or both feet or both eyes or hearing in both ears or speech which prevent the person from engaging in any gainful employment that is medically determined by a physician. Review of Ms. Wixon's chart and records indicate that she does have at least two ext*remities involved, a right knee that was a total knee replacement and a left shoulder difficulty. She has other problems as well. This would, based upon my interpretation of the document, indicate that she meets the criterion for permanent and total disability.*

Answer to Mot. Ex. Ex. 8, Higginbotham Report (Oct. 14, 2002) at 1 (emphasis added). Dr. de Bari testified:

> Q. Let me ask you first assuming that the policy reads that for permanent total disability there must be an accidental bodily injury that solely and directly caused the primary insured person in this case use of one hand and one foot. And assume that loss of use means the permanent and total inability of the specified body part to function as determined by a physician.
>
> First off do you have an opinion within a reasonable degree of medical certainty as it relates to whether you feel Ms. Wixon has a loss of use in regard to her left upper and left lower extremity?
>
> MS. WHEATON: Object to form. The policy speaks for itself, you didn't quote from the whole thing. You can answer.
>
> A. Yes, I believe she does.
> Q. And why?

-18-

A.  Well, again with the left shoulder she has inability to use her arm above shoulder height.  Certainly she has difficulty with any lifting, pulling, pushing, twisting with the upper extremity.  And certainly in terms of her usual employment she wouldn't be able to do any of that.

The left knee as well she cannot tolerate standing and twisting, kneeling and doing a lot of activities with her knee.  So I don't think that she'd be able to return to much in the way of gainful employment because of that.
Q.  In your opinion has she reached maximum point of recovery or does she still require continuing care?
A.  I don't think she's reached maximum medical improvement anyway at this point.  You know my plan is to try to see what I can do to get rid of her shoulder pain, try to improve that still.  And the knee is the same sort of thing, trying to do some different things with exercising and potentially re-operating on her.  So I don't think she's reached her medical improvement yet, maximum improvement.
Q.  Everything that you've testified to today has been within a reasonable degree of medical certainty?
A.  Yes.

Answer to Mot. Ex. 4, Dep. of Dr. deBari at 23-24.  Dr. Sperl testified that the plaintiff's injuries

met the definition of loss of use within the meaning of the policy:

Q.  No Doctor, I had you examine Ms. Wixon not only to gain your opinion as to what conditions, if any, she suffered from but also to advocate from you relative portions of a disability policy, is that correct?
A.  Correct.  In fact, I have that here in front of me, yes.
Q.  Okay.  Can you recite, please, for the Court what you are looking at when attempting to determine whether or not Ms. Wixon met the policy language?
A.  Well, what I'm looking at specifically is, number one, the medical diagnosis, what's the problem with her medically from a physician's perspective.  Number two, medically what her limitations are regarding the left shoulder, the left knee and the left hand, and then, third, applying it to the disability language, which we do frequently in terms of the policy itself.

Her functional loss of use, not just what she can do or can't do, but the functional implications for her daily life activities and her vocational activities or work activities.

And then conclusions drawn were basically that she has a number of orthopedic findings which indicate a functional limitation for her usual and customary employment duties, and the policy language talks about eyes, ears, hearing, sight, extremities, and here they're talking about one upper extremity and one lower extremity, and she meet that qualification.

Answer to Mot. Ex. 5, Dep. of Dr. Sperl at 17-18.

There is conflicting evidence concerning which lower extremity was injured as a result of the accident.  Dr. Higginbotham found that it was the right lower extremity.  Drs. deBari and Sperl found that use of the left lower extremity was lost as a result of the accident.  There is testimony that Higginbotham's finding was a typographical error.  Pl.'s Response Ex. 2, Christopher Evans Dep. at 43.  Nonetheless, given the testimony and evidence presented, the plaintiff has made a showing sufficient to survive summary judgment on this issue.

D.

Finally, the defendants contend that the plaintiff could work in the full time sedentary to light employment.  Consequently, they argue, the plaintiff does not meet the policy requirement that she is prevented "from engaging in any gainful occupation for which [she] is qualified, or could be qualified, by reason of education, training, experience, or skill."

The defendants cite Dr. Frye's report, which states "[i]n my opinion, Ms. Wixon is capable of returning to her employment which appears to be sedentary or light at the most.  She may do so without restrictions."  Def.'s Mot. Summ. J. Ex. F, Dr. David Frye Report (July 18, 2001) at 7.  Dr. Rumney found that the plaintiff could work as a nurse in a sedentary capacity.  Def.'s Mot. Summ. J. Ex G, Dr. Thomas Rumney Dep. at 33-34.  Dr. deBari also testified that the plaintiff was capable of some nursing work.  Answer to Mot. Ex. 4, Dep. of Dr. deBari at 20-21.

The plaintiff notes that Dr. deBari also opined that the plaintiff cannot perform her nursing duties:

> Q.  In your opinion and based on your knowledge of an LPN do you feel that, what is your opinion as to Ms. Wixon's ability to return to that type of work?
> A.  I don't believe she'd be able to do that type of work at all.

-20-

*Id.* at 20-21.  Dr. Sperl also testified that the plaintiff was not capable of returning to the for which work she was qualified:

> Q.  You may have answered ths previously, but your opinion with regard to her ability to return to work as an LPN as she described it?
> A.  My opinion, number one, based upon her history, clinical findings and later then upon the records was that she is functionally disabled from performing her usual and customary employment duties, which by her training and experience is as a homecare nurse's aide, LPN, caregiver.

Answer to Mot. Ex. 5, Dep. of Dr. Sperl at 19-20.

In addition, the plaintiff testified that she has been awarded Social Security Disability benefits.  Presumably, she has been found disabled within the meaning of Title II of the Social Security Act.  A claimant suffers from a disability within the meaning of the Social Security Act "only if his physical or mental . . . impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(1)(B).

The Social Security disability finding is not conclusive on the issue of whether the plaintiff is totally and permanently disabled within the meaning of the policy.  But evidence of her entitlement to benefits, taken together with the testimony of her treating and examining physicians, provides sufficient facts from which a fact finder could determine that this portion of the policy has been satisfied.

## III.

The Court finds that the plaintiff has brought forth sufficient evidence to allow her to present her case to a jury.  There are genuine issues of material fact that preclude judgment in favor of the

defendant as a matter of law.  Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt # 19] is **DENIED**.

It is further **ORDERED** that the case management and scheduling order is modified as follows: the parties shall present their proposed joint final pretrial order to chambers on or before **August 22, 2005**; the final pretrial conference shall take place in chambers on **Monday, August 29, 2005 at 2:00 o'clock in the afternoon**; trial shall commence on **Tuesday, September 13, 2005 at 8:30 o'clock in the forenoon**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: July 14, 2005

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 14, 2005.

s/Carol J. Greyerbiehl
CAROL J. GREYERBIEHL